| | | |
|---|---|---|
| LISA WHITNEY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 04231 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lisa Whitney seeks judicial review of a final decision by the Commissioner of the Social Security Administration, denying her disability insurance benefits and supplemental security income under the Social Security Act, 42 U.S.C. §§ 423(d), 1381a, and 1382c(a)(3)(A). The parties have filed cross-motions for summary judgment. R. 18, 27.[1] For the reasons stated below, Whitney's motion for summary judgment is granted in part and denied in part [R. 18], and the SSA's motion is denied [R. 27].

## I.

In February 2007, Whitney applied for disability insurance benefits and supplemental security income, alleging that she was disabled since April 1, 2005. Tr. 107.[2] The SSA denied Whitney's application both initially and upon reconsideration.

---

[1]The Court has jurisdiction under 28 U.S.C. § 1331. Citation to the docket is "R." followed by the entry number.

[2]"Tr." refers to the administrative transcript filed as docket entry 10.

Tr. 62-80. In January 2008, Whitney filed a timely written request for a hearing before an administrative law judge (ALJ). Tr. 81. In March 2009, Whitney, represented by counsel, appeared and testified before the ALJ. Tr. 26. A medical expert was the only other witness who testified. *Id.* In May 2009, the ALJ issued a written decision denying Whitney's claim for benefits. Tr. 53-59. The SSA's Appeals Council denied Whitney's request for review in May 2010, making the ALJ's ruling the final decision of the Commissioner under 42 U.S.C. §§ 405(g), 1383(c)(3). Tr. 1-3; 20 C.F.R. § 404.981. This suit followed. R. 1.

## II.

### A.

Whitney was born in 1971, and was 33 years old at the time of her alleged disability onset date. Tr. 107. She is divorced and has two children who live with her ex-husband. Tr. 28. Whitney has completed her GED and a "couple college courses." Tr. 29, 161.

Whitney's documented work history shows sporadic employment. Her first and longest period of employment was with a grocery store, where she worked as a cashier from 1988 to January 2005. Tr. 163. After she was let go from the store, she found a new job as a telemarketer in February 2005. *Id.* Whitney remained there for about one month. *Id.* She then moved to a job as a cashier from December 2006 until around March 2007.[3] Her next period of employment began and ended in June 2007, when she

---

[3]In the administrative record, there is a reference to another cashier position beginning in December 2006 and running through "present" on a "Work History Report." Tr. 154, 163.

worked as a cashier for less than a month. Tr. 31. Five months later, she found employment with Varsity Calendar. Tr. 32. This job also lasted for only one month. *Id.* In 2008, Whitney held two separate jobs as a store clerk: one in January, and the other in July. Tr. 30. Both jobs lasted less than one month. Tr. 30-31. Finally, she worked as a convenience store cashier for a few weeks in February 2009. Tr. 29.

## B.

Whitney, represented by counsel, appeared and testified before the ALJ in March 2009. Tr. 27. The ALJ first questioned Whitney about her employment history. Whitney testified that she was let go from her first cashier job in 2005 because her medical treatments conflicted with her work schedule. Tr. 32-33. She testified further that she quit each job she held from 2007 to 2008. Tr. 30-32. Whitney stated that she struggled with stress and personality conflicts at work. *Id.* Lastly, she explained that she was released from her cashier job in 2009 because her "till came up short." Tr. 29. Since then, Whitney has not obtained any other type of employment. *Id.*

Next, the ALJ asked Whitney about her health problems and symptoms. Tr. 33. Whitney testified that she was diagnosed with delusional disorder in 1997 and experiences anxiety, panic attacks, anger management problems, and suicidal ideations as well. Tr. 33-38. Whitney labeled her anxiety as constant and stated that

---

However, the form is not completed, signed, or dated, so it is unclear how long Whitney held this cashier position. *Id.* It appears that the work history report was attached to a March 23, 2007 letter sent by Whitney's counsel, so one could infer that Whitney was employed in this cashier position from December 2006 until at least March 2007. At the ALJ hearing, when asked about her work experience, and specifically about work experience in 2006 and 2007, Whitney made no mention of this cashier position at Certisaver. Tr. 31.

it causes her to pace around the house. Tr. 36-37. When describing her panic attacks, she testified that her hands go numb, her ears start to ring, and it feels like she is having a heart attack. Tr. 37. Furthermore, Whitney stated that she regularly becomes paranoid about the people around her and believes that they are persecuting her. Tr. 33, 37. In one example, she explained that she believed her treating physician at the time was "sending people into mess with [her] at work . . . ." Tr. 37. She also testified that she has a short temper and tends to "snap over things that normal people wouldn't . . . ." Tr. 33. Lastly, she stated that she easily becomes suicidal and has already made two attempts on her life. Tr. 34.

The ALJ also questioned Whitney about her record of cocaine and alcohol abuse. Tr. 33. Whitney testified that although she was not currently in treatment, she stopped using cocaine one month before the hearing. Tr. 33-34. She also stated that she is no longer abusing alcohol. Tr. 34. Moreover, Whitney explained that she was not currently taking her prescribed medication and had stopped seeing a doctor since the end of 2008. *Id.*

Regarding her daily activities, Whitney testified that she mostly sleeps, watches television, and listens to music. Tr. 35. She cannot drive due to a suspended license, but will sometimes walk to a nearby store. Tr. 35-36. She also stated that she does not help around the house and has a contentious relationship with her housemates—her mother and her mother's boyfriend. Tr. 33, 38.

## C.

Medical documentation in the administrative record covers the period between 1999 and 2007. Throughout most of this time, Whitney received psychiatric treatment from Dr. Riaz Baber for paranoid delusions. Tr. 227-41. Dr. Baber saw Whitney at least once every four months from June 1999 until February 2005. *Id.* During the first two years of treatment, Dr. Baber's notes mention that Whitney complained regularly of being paranoid. Tr. 239-41. The same notes also reported, however, that Whitney admitted consuming alcohol heavily. *Id.* Furthermore, the notes stated that Whitney had tried to stem her alcohol use, but would regularly relapse. *Id.*

During the latter four years of treatment, Dr. Baber noted that, while struggling with paranoid delusions and anxiety, Whitney began abusing drugs in addition to alcohol. Tr. 227-239. The doctor specifically mentioned the following drug and alcohol use: cocaine in May 2001 and December 2004, marijuana in October and November 2002, crystal meth in June 2004, and heavy drinking in August 2003 and August 2004. *Id.*

One other noteworthy progress note written by Dr. Baber is from November 20, 2001. Here, the doctor documented that Whitney had a 75-day period of sobriety. Tr. 238. But Whitney complained that, during this period, she began "crying a lot" lately. *Id.* She had also just learned that her son had been diagnosed with Asperger's Syndrome. *Id.*

In addition to Dr. Baber's notes, Whitney's medical records show that she has received care at several hospitals and treatment facilities in the Chicago area for

mental distress and substance abuse. Beginning in February 2003, Whitney went to Linden Oaks Hospital to receive treatment for her depression and paranoid thinking. Tr. 252. During her month-long stay, she was diagnosed with schizoaffective disorder and received individual and group therapy. Tr. 252, 263. During a psychiatric evaluation, she admitted to having a history of cocaine dependence, heavy alcohol use, and abusing her medications. Tr. 256, 263. Upon discharge from the hospital, the psychiatrist adjusted her medication and urged her to comply with her medication management plan. Tr. 252.

In November 2004, Whitney sought treatment for "addiction to crack cocaine and also alcohol dependence" at Central DuPage Hospital. Tr. 274. During the hospital-admission process, she reported smoking crack cocaine regularly for the past two to three months. *Id.* With regard to Whitney's alcohol dependence, she admitted to having a "revolving door" experience with Alcoholics Anonymous. *Id.* Whitney was discharged from the hospital after only a few days due to her noncompliance with the treatment plan. Tr. 275-76.

Despite being discharged, Whitney attended a follow-up psychiatric evaluation with Dr. Melvin Hess, a psychiatrist with Central DuPage Hospital on November 24, 2004. Tr. 277-79. During this evaluation, Dr. Hess diagnosed Whitney with major depression, a potential bipolar disorder, and cocaine dependence. Tr. 279. He also noted that Whitney's history of addiction, starting with alcohol in 1997, had progressed to gambling and crack cocaine in later years. *Id.* Lastly, Dr. Hess indicated that Whitney was not taking all of her prescribed medication. *Id.*

Whitney sought treatment for substance abuse at the Haymarket Center's drug and alcohol detox program in May 2005. Tr. 346. However, Whitney ended her program after only a few days, when she requested to be discharged to a halfway house against the advice of the staff. *Id.* Less than one month later, Whitney checked into Westlake Hospital following three straight days of crack cocaine use and a suicide attempt. Tr. 298. She reported being depressed and tested positive for cocaine upon being admitted. *Id.* The following day she was transferred to the Madden Health Center for treatment and detox. *Id.* There, Whitney was diagnosed again with major depression, dysthymia, alcohol and cocaine dependence, and a gambling addiction. Tr. 294-95. Unfortunately, she again wanted to be discharged, and that occurred after only one week. Tr. 296-98.

In November 2005, Whitney was accepted back into the Haymarket Center's detox program. Tr. 333-39. During this visit, Whitney complied with the treatment plan for about two weeks, but then complained of an allergic reaction to her medication. Tr. 490. She left to go to the Cook County Hospital emergency room and did not return to the program. *Id.*

Whitney's next hospital visit occurred at Mount Sinai Hospital in April 2006. Tr. 349-50. She went to the emergency room complaining of anxiety and cocaine abuse. *Id.* Later, she admitted to having used cocaine, without eating any food, for the past three days, after which, she felt like she was "going to die." Tr. 349, 353.

About eight months later, Whitney received another psychiatric evaluation when she sought a refill for her medications at Cook County Hospital. Tr. 516. During the exam, Whitney complained that she could not sleep at night, was full of energy,

continued to have paranoid thoughts, and had trouble focusing. *Id.* Overall, the psychiatrist concluded that Whitney had both "mood/affect disorder" and "poly-substance dependence." Tr. 517.

Whitney continued her pattern of substance abuse, detox, and relapse throughout 2007. In January of that year, Whitney visited Westlake Medical Associates, complaining of severe anxiety and chest pains related to recent cocaine use. Tr. 592-95. The following month, Whitney sought help through the SHARE program, where she successfully completed 30 days of inpatient rehabilitation. Tr. 591. Unfortunately, Whitney relapsed soon thereafter, and in July she was admitted back into the Haymarket Center for detox treatment related to her cocaine dependence. Tr. 457. In Whitney's Referral Summary, she admitted to using some form of cocaine in 62 of the past 90 days, using heroin in 62 of the past 90 days, and smoking marijuana on occasion. Tr. 452-53. Although Whitney created a four-month plan for getting clean, she voluntarily left the facility in early September. Tr. 490.

Before leaving the Haymarket Center, Whitney conducted an hour-long interview with Dr. Gloria Berkwitz, a state-agency psychiatrist. Tr. 474-77. At first, Dr. Berkwitz questioned Whitney about her prior medical history and daily life activities. Tr. 474-75. Whitney's chief complaint was that she experienced "delusional thinking [and] visual and auditory hallucinations at times." Tr. 476. Dr. Berkwitz then conducted a mental examination. She noted that Whitney's memory, judgment, and insight were essentially intact, but that Whitney had difficulty with abstract thinking. Tr. 476, 490. Following the exam, Dr. Berkwitz diagnosed Whitney with "bipolar

disorder, based on history." Tr. 477.

In November 2007, Dr. Donald Cochran, a state agency reviewing psychiatrist, completed Whitney's Psychiatric Review Technique. Tr. 478-90. Dr. Cochran concluded that Whitney's condition qualified for two listed impairments: 12.04 Affective Disorder ("Bipolar [Disorder] in the context of [Drug Abuse and Alcoholism]"), and 12.09 Substance Addiction Disorder. Tr. 481, 486. Furthermore, he found only moderate limitations to the following: restrictions on daily activities, difficulties in maintaining social functions, and difficulties in maintaining concentration, persistence or pace. Tr. 488. He did, however, find a marked impairment with respect to episodes of decompensation. *Id.* Additionally, Dr. Cochran stated in his Residual Functional Capacity Assessment that although Whitney had a history of non-compliance with substance abuse treatment, her symptoms have improved "after a period of sobriety and apparent compliance." Tr. 494.

At Whitney's hearing with the ALJ in March 2009, Dr. Kathleen O'Brien, a psychologist, testified as the sole medical expert. Tr. 39-45. Dr. O'Brien is an associate professor of psychology at the Illinois School of Professional Psychology and is board certified as a forensic psychologist. Tr. 42. In the private sector, her primary practice involves conducting evaluations, assessments, and expert testimony; however, she does not actually treat patients. *Id.*

After reviewing the entire record to date, Dr. O'Brien concluded that it showed primary diagnoses of "alcohol, cocaine, and opiate dependency[,] as well as a gambling addiction." Tr. 39. She also added that Whitney's record indicated a "history of mood

9

disorders that's been alternatively described as major depressive disorder, bipolar affective disorder, at one point, schizoaffective disorder or delusional disorder." *Id.* Moreover, Dr. O'Brien stated that in Whitney's current state, her ability "to function at a job [was] . . . very unlikely." Tr. 40.

Nevertheless, in Dr. O'Brien's opinion, if Whitney were to complete a "long period of sobriety, . . . [her] mood disorder . . . would abate with proper treatment…." *Id.* Moreover, she believed that Whitney "has a choice between using drugs and alcohol or getting treatment, . . . [but] has chosen to use drugs." Tr. 44. As a result, Dr. O'Brien concluded that Whitney's substance abuse was a contributing factor material to her disability. Tr. 41.

After the hearing, Whitney's counsel solicited Dr. Mark Amdur, a general psychiatrist, to evaluate Whitney and to review her record. Tr. 600-4. Dr. Amdur conducted an hour-long, in-person evaluation on March 23, 2009. Tr. 600. He questioned Whitney about her chief complaints and her past medical, substance abuse, psychiatric, vocational, and personal history. Tr. 600-02. Dr. Amdur also conducted a full mental examination. Tr. 603. He concluded that "Whitney suffers from an enduring bipolar disorder that persists even if substance abuse were to cease or were not a factor." *Id.*

## D.

Based on the medical record and the testimony adduced at the hearing, the ALJ applied the five-step sequential evaluation process mandated by the Social Security regulations. *See* 20 C.F.R. § 404.1520 (2012). The ALJ first found that Whitney was not

currently engaged in any substantially gainful activity. Tr. 56. At step two, the ALJ found that Whitney had a medically determinable severe impairment: "ongoing substance abuse with a related mood disorder." *Id.* During step three, the ALJ determined that Whitney's impairment qualified as two different listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1: 12.04 (Affective Disorder) and 12.09 (Substance Addiction Disorder). *Id.*

Before proceeding to step four, however, the ALJ determined that Whitney's substance abuse was a contributing factor material to her disability. Tr. 57-58; *see* 20 C.F.R. § 404.1535. He concluded that if Whitney "stopped her substance abuse, her remaining limitations would not cause more than a minimal impact on her ability to perform basic work activities . . . ." Tr. 57. According to the ALJ, the record showed that Whitney's "mood disorder is directly connected to her substance abuse involving cocaine, heroin, crystal meth, cannabis and alcohol intermittently and together." Tr. 58.

In reaching this decision, the ALJ mentioned both Dr. O'Brien's expert testimony and Dr. Amdur's post-hearing evaluation. Tr. 57-59. The ALJ believed that the evidence was more "consistent with the testimony of [Dr. O'Brien]," whereas "the record as a whole" did not support the opinion of Dr. Amdur. Tr. 58. As a result, the ALJ relied heavily on Dr. O'Brien's testimony. The ALJ noted that Whitney had not "had any long periods of treatment or sobriety wherein the severity of her bipolar or anxiety symptoms could be evaluated independent of the substance abuse." *Id.* Thus, the ALJ found that Whitney was not disabled. Tr. 59.

# III.

Judicial review of the SSA's decision is governed by 42 U.S.C. § 405(g). *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). When, as here, an ALJ's decision constitutes the final action of the SSA, the Court's task is to examine the decision "to determine whether substantial evidence supports it and whether the ALJ applied the proper legal criteria." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The Court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 2001). Finally, while "judicial review of the decisions of administration agencies is deferential, it is not abject" and this Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (internal citations omitted); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues).

# IV.

## A.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. *See* 42 U.S.C. § 423(d)

(2004).[4] The claimant must show that she is "disabled" due to her inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last continuously for more that 12 months. § 423(d)(1)(A). The claimant must also establish that she was disabled on or before her date last insured. § 423(a)(1)(A), (c)(1); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

A claim of disability is evaluated under a five-step analysis. *See* 20 C.F.R. § 404.1520; *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004). In the first step, the ALJ considers whether the claimant is working and whether such work is "substantial gainful activity." 20 C.F.R. § 404.1520(b). If the claimant is not working, the ALJ will address step two: whether the claimant has a medically "severe impairment." *Id.* at § 404.1520(c). At step three, the ALJ must decide whether the claimant's impairment or combination of impairments equals a listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.* at § 404.1520(d). If the impairment meets or equals one of the listed impairments, then the applicant is conclusively disabled. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

If the impairment does not meet or equal a listed impairment, the evaluation continues to an assessment of the claimant's residual functional capacity. 20 C.F.R.

---

[4]42 U.S.C. § 423(d) applies to applications of disability benefits. Supplemental security income is covered by identical provisions found in 42 U.S.C. § 1382c(a). *Doughty v. Apfel*, 245 F.3d 1274, 1276 n.1 (11th Cir. 2001). For simplicity, the Court will only refer to § 423(d) throughout the opinion.

§ 404.1520(a)(iv). Once the claimant's capacity is determined, the ALJ will evaluate whether she can perform her past relevant work during step four. *Id.* If she is unable to perform past relevant work, the analysis proceeds to the fifth and final step: whether the claimant is able to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof regarding her disabling condition at steps one through four. *Id.* at § 404.1514; *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991). At step five, the burden shifts to the SSA to prove that a significant number of jobs are available in the national economy for an employee with the claimant's ability. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**B.**

**1.**

An extra analytical step is needed if there is medical evidence of substance abuse or alcoholism. *See* 20 C.F.R. § 404.1535. Since 1996, Congress has directed that "[a]n individual shall not be considered to be disabled for purposes of [Social Security] if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). As a result, "[w]hen an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the [ALJ] is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1535(b)(1). In this case, Whitney's overarching contention is that the ALJ erred

in finding that her substance abuse was a contributing factor material to her debilitating mood disorder. R. 19.

The Seventh Circuit has not yet conclusively decided which party—the SSA or the claimant—bears the burden of proof on whether substance abuse is a material factor in a claimant's disability. (As discussed later, there is only one unpublished, and thus non-precedential, case on the issue. *Harlin v. Astrue,* 424 Fed. App'x 564, 567 (7th Cir. 2011).) Other Circuits are split: three have concluded that the claimant bears the burden, whereas two others have held that the burden rests with the SSA. As explained below, this Court holds that the SSA bears the burden because the SSA is the party asserting the benefit of an *exception* to the general definition of "disabled."

That interpretive approach to deciding who bears the burden is well-established. "[T]he burden of proving justification or exemption under a special exception to the prohibition of a statute generally rests on the one who claims its benefits." *N.L.R.B. v. Kentucky River Cmty Care, Inc.*, 532 U.S. 706, 711 (2001) (quoting *F.T.C. v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948)). The Supreme Court established this rule in the early nineteenth century and has continued to extend its application ever since. *See E.E.O.C. v. Chicago Club*, 86 F.3d 1423, 1430 (7th Cir. 1996). Most recently, in *Kentucky River*, the Supreme Court applied this canon to the National Labor Relations Act. The Act did not explicitly specify which party has the burden of proving whether an employee is a "supervisor" under the Act. *Id.* at 710. Under the Act, "employees" are entitled to certain bargaining rights; "supervisors" are an exception to this general class and do not have the same rights. *Id.* at 708; *see also* 29 U.S.C. § 152. In *Kentucky*

*River*, the operator of a mental health care facility claimed that certain nurses were supervisors. 532 U.S. at 708-09. The Court held that it was the employer who had to bear the "burden of proving the applicability of the supervisory exception," because the employer sought the benefits of the exception. *Id.* at 711.

Similarly, here the interpretive approach can be applied to the Social Security Act in order to determine which party bears the burden of establishing that alcohol or other substance abuse is a material factor. Like the National Labor Relations Act's general definition of "employee," the Social Security Act provides a general definition of "disability" under 42 U.S.C. § 423(d)(1). Section 423(d)(2)(C) then carves out the substance abuse exception, just as the National Labor Relations Act creates a separate supervisory exception. In both statutory frameworks, there is a general definition that would otherwise cover a situation and then an exception to the general definition. Because the SSA is the party that seeks the benefits of the statutory exception, the SSA bears the burden of proving the applicability of the exception.

As mentioned above, there is an unpublished (and thus non-precedential, Seventh Circuit Rule 32.1(b)) opinion from the Seventh Circuit on this issue, and admittedly this Court's conclusion might contradict that opinion. *Harlin v. Astrue,* 424 Fed. App'x 564, 567 (7th Cir. 2011). At one point in the opinion, *Harlin* states: "The claimant bears the . . . burden of proving that alcoholism or drug addiction is not a contributing factor." *Id.* For that proposition, the opinion cites cases from three other circuits: the Fifth, Eighth, and Eleventh. *Id.* But *Harlin* later relies on an Emergency Teletype (a type of internal SSA policy, discussed in detail below), which dictates that

16

the *SSA* bears the burden. *Id.* at 568. Although *Harlin* did not decide whether the Teletype is binding in federal-court litigation (as potentially distinct from SSA claims processing), *Harlin* arguably put the burden on the SSA by holding that "the ALJ [had] not adequately disentangled the effects of Harlin's drug abuse from those of her other impairments." *Id.* In any event, *Harlin* is not published and does not control. Seventh Circuit Rule 32.1(b).

Turning to the other Circuits, three of them have explicitly placed the burden on the claimant. The Fifth Circuit, in *Brown v. Apfel*, held that 42 U.S.C. § 423(d)(2)(C) simply amends the definition of disability, and because the claimant bears the burden of proving their disability in steps one through four, the claimant also bears the burden of proving that the exception is inapplicable. 192 F.3d 492, 498 (5th Cir. 1999). Similarly, in *Parra v. Astrue*, the Ninth Circuit held that the burden rests on the claimant to establish her entitlement to disability benefits at all times—this includes proving that there is no applicable exception. 481 F.3d 742, 748 (9th Cir. 2007). Lastly, in *Doughty v. Apfel*, the Eleventh Circuit held that the burden rests with the claimant by adopting the reasoning of the Fifth Circuit. 245 F.3d 1274, 1279-80 (11th Cir. 2001).

This Court respectfully disagrees. It is true, as those Circuits state, that the claimant bears the burden to prove disability. But the claimant has done that—the actual question is whether an exception then brings her out of the general definition. The substance-abuse provision is more aptly described as carving out an exception to a finding of disability than as an amendment to the general definition of disability. The important difference is that an exception "curtail[s] or restrict[s] the operation of a

17

statute in a case to which it would otherwise apply." *E.E.O.C. v. Chicago Club*, 86 F.3d 1423, 1430 (7th Cir. 1996). Here, a finding that the claimant is disabled is then potentially curtailed or restricted by substance abuse. The invoker of this exception—the SSA—bears the burden of proving it.

Two Circuits have ruled either explicitly or effectively that the SSA bears the burden. The Tenth Circuit held that the SSA bears the burden based on "Emergency Teletype No. EM-96-94," issued as an internal instruction by the SSA to its own examiners. *Salazar v. Barnhart*, 468 F.3d 615, 625 (10th Cir. 2006). The Teletype dictates that if an SSA examiner cannot project what limitations would remain if a claimant stopped using drugs or alcohol, the examiner must find that the substance abuse is not a contributing factor. *Id.* at 623. This reliance on the Emergency Teletype grants too much authority to an agency's internal instructions: the Teletype is simply a response to frequently asked questions from the field. As convincingly explained by the Ninth Circuit, such internal guidance is neither binding on the agency nor entitled to deference in the courts. *Parra*, 481 F.3d at 748-50. To be sure, if the SSA were to adopt the language of the Teletype as a litigation position, the internal document could be entitled to greater consideration. *See Auer v. Robbins*, 519 U.S. 452, 461-622 (1997) (holding that an agency's position set forth in a legal brief, in a case in which the agency is not a party, is entitled to deference). But here the government did not adopt this position in its brief (the brief does not mention who bears the burden of proving materiality), and thus the Court gives the Teletype no weight.

Returning to the discussion of other Circuits, the Eighth Circuit also seems to place the burden on the SSA. It is true that, in *Kluesner v. Astrue*, the Eighth Circuit first stated that the burden rests with the claimant. 607 F.3d 533, 537 (8th Cir. 2010). But in the same opinion, the Eighth Circuit held that "[i]f the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow." *Id.* (quotation and citation omitted). This latter statement suggests a tie-goes-to-the-claimant approach, and thus—in effect—the burden of proving the exception falls on the SSA. As explained above, that is the Court's conclusion as well.

### 2.

The next step after determining who bears the burden of proof is to examine Whitney's claims. She argues both that the ALJ's decision lacked the weight of substantial evidence and that the ALJ committed several reversible errors of law. R.19 at 10-14. Although the ALJ did not commit any legal errors, the Court agrees with Whitney that the ALJ's findings are not supported by substantial evidence.

The ALJ's determination that Whitney would not have a severe mental impairment if she stopped abusing drugs and alcohol is not supported by substantial evidence. In order to show that the decision is substantially supported by the record, the "ALJ need only build 'a bridge from the evidence to his conclusion.'" *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)). In other words, "the ALJ [must] rationally articulate [his] decision."

*Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Here, the rationale supplied by the ALJ does not build a functioning bridge.

Examination of the ALJ's decision reveals that important evidence—evidence that cut against the ALJ's conclusion—was not adequately addressed. At bottom, the ALJ's disability determination rests on the conclusion that "if [Whitney] stopped abusing substances, she would not have an impairment . . . that would significantly limit her ability to perform basic work activities . . . ." Tr. 58. The ALJ offered two main sources of evidence: Whitney's treatment substance-abuse records and Dr. O'Brien's testimony. *Id.*[5] While the medical records paint an extensive history of drug and alcohol use, the ALJ relied on Dr. O'Brien's testimony to establish Whitney's substance abuse as the source of her mood disorder. *Id.* But, in light of other evidence available to the ALJ, and the shortcomings in O'Brien's testimony, O'Brien's testimony is insufficient to establish this causal connection.

The reasoning of Dr. O'Brien's testimony proceeds as follows: Whitney's primary diagnosis is substance abuse, but she also suffers from a severe mood disorder. Tr. 39. Her mood disorder is "substantially impact[ed]" by her drug use, and would abate with proper treatment. Tr. 40. But Whitney "has not had any long periods of treatment or sobriety." Tr. 58. As a result, there is no evidence to rebut the notion that Whitney's severe mood disorder would cease if she stopped her substance abuse. Thus, her abuse

---

[5]The ALJ also noted Whitney's prior criminal history and gambling addiction as evidence; neither is relevant, however, to resolving whether her substance abuse is material to a finding of disability.

is a contributing factor material to the mental limitations that prevent her from working. Tr. 41.

This testimony suffers from three problems. First, there is evidence in the record that challenges Dr. O'Brien's premise that Whitney did not have any long periods of sobriety. Dr. Baber, Whitney's treating psychiatrist for six years, documented a 75-day period of sobriety where Whitney was "still crying a lot." Tr. 238. Dr. O'Brien's testimony did not discuss or refer to this relevant period of sobriety. Nor did Dr. O'Brien define what range of time would qualify as a "long" period of sobriety. It is unclear whether this 75-day period could be long enough to establish some evidence of a mood disorder apart from Whitney's substance abuse.

Second, Dr. O'Brien's testimony primarily focused on whether there is evidence that Whitney's mood disorder would continue if Whitney stopped using drugs and alcohol. But the relevant inquiry is not whether there is evidence that the mood disorder exists entirely *independent* of Whitney's substance abuse. Instead, the inquiry is whether Whitney's substance abuse is *material* to her debilitating mood disorder. *See* 20 C.F.R. § 404.1535(b). In other words, the ALJ's ruling puts the onus on a claimant like Whitney to have a long period of sobriety, or else the claimant will never be able to receive disability benefits. To be sure, it is difficult to disentangle the effects of substance abuse and the symptoms of severe mental disorders, such as bipolar disorder. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). Nevertheless, the ALJ simply cannot demand a long period of sobriety as a solution to this evidentiary problem, especially because it is the SSA that bears the burden of proving materiality.

Consequently, that Whitney's symptoms "are not established independent of [her substance] abuse" is insufficient support to find that the substance abuse was material to her disability. Tr. 58.

Lastly, the ALJ's opinion did not adequately address Dr. Amdur's post-hearing report. In direct conflict with Dr. O'Brien's testimony, Dr. Amdur opined that Whitney suffers from bipolar disorder "even if substance use were to cease or were not a factor." Tr. 603. In light of this discrepancy, the ALJ was compelled to determine which expert opinion commanded more weight. The ALJ stated that Dr. O'Brien's testimony was more "consistent with" the medical evidence, whereas Dr. Amdur's report was not supported by the "record as whole." Tr. 58. To be sure, ALJs routinely weigh experts against one another, and ALJs have wide discretion in weighing expert testimony as the finder of fact. *See Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) ("The ALJ has the authority to assess the medical evidence and give more weight to evidence he finds more credible") (citations omitted). But the ALJ must still "minimally articulate his reasons for crediting or rejecting evidence of disability." *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (citation omitted). Here, the ALJ dismissed Dr. Amdur's opinion by simply citing the "record as a whole." Tr. 58. This was an insufficient analysis of Dr. Amdur's report. This is especially true given that Dr. Amdur actually met with, interviewed, and tested Whitney to formulate his report, and, in contrast, Dr. O'Brien not only did not meet Whitney, but Dr. O'Brien also lacks experience in treating patients. Tr. 42. A more full analysis of Dr. Amdur's report is necessary.

On remand, the ALJ should receive supplemental evidence, such as by requiring experts to respond to post-hearing interrogatories to clarify earlier testimony. *See e.g. Tom v. Heckler*, 779 F.2d 1250, 1252 (7th Cir. 1985); *Blackwell v. Barnhart*, 258 F. Supp.2d 851, 858-59 (N.D. Ill. 2003). In this case, additional testimony by Dr. O'Brien is necessary to clarify the basis for her opinion, upon which the ALJ relied so much, especially in light of the contradictory report provided by a doctor who actually interviewed Whitney.

## C.

For the sake of completeness, and to guide the proceedings on remand, the Court addresses one other argument made by Whitney, because this argument could impact the remand. Whitney argues that the ALJ erred by relying on the testimony of an "unqualified medical expert"—Dr. O'Brien. R. 19 at 10-11. The concerns with Dr. O'Brien's testimony are discussed in detail above, but Whitney cites no authority for the proposition that Dr. O'Brien is an unqualified expert as a matter of law and cannot testify at all. Dr. O'Brien is a licensed, board-certified forensic psychologist. Tr. 605. Furthermore, psychologists are regularly called to testify in SSA cases involving mental impairments. *See e.g. Larson v. Astrue*, 615 F.3d 744, 747 (7th Cir. 2010). Although Dr. O'Brien's testimony so far is insufficient to demonstrate a material link between Whitney's substance abuse and mental disorder, Dr. O'Brien is qualified to offer an opinion.

**IV.**

For the reasons stated above, Whitney's motion for summary judgment, R. 18, is granted in part and denied in part, and the Commissioner's motion for summary judgment, R. 27, is denied. The ALJ's decision is vacated and remanded for reconsideration consistent with the instructions outlined in this order.

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: August 24, 2012